UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                  :
ANA S. TEJADA,                    :
                                  :
          Plaintiff,              :
                                  :     REPORT AND RECOMMENDATION
     -against-                    :     05 Civ. 5349 (CM)(MDF)
                                  :
COMMISSIONER OF SOCIAL SECURITY,  :
                                  :
          Defendant.              :
                                  :
----------------------------------X

TO: THE HONORABLE COLLEEN McMAHON, U.S.D.J.

Ana Tejada (the "Plaintiff"), proceeding *pro se* and *in forma pauperis*, brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's application for Social Security Income ("SSI") benefits.  The Commissioner has moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.  The Plaintiff has not responded to the motion.  For the reasons set forth below, I recommend that your Honor deny the Commissioner's motion and remand the matter to the Administrative Law Judge ("ALJ") for further development of the record.

## I.  BACKGROUND

Plaintiff filed an application for SSI benefits in July 2003, with a protective filing date of June 25, 2003.  *See*

1

Administrative Record ("AR") at 54.  She asserted that she suffered from a heart condition, chest pain, back pain, and psychiatric problems and that the date of onset of her disability was December 9, 2002.  *See id*. at 57-66.  With respect to her work history, Plaintiff indicated that she received public assistance and that she "worked for [her] benefit (welfare)."  *Id*. at 59.  Plaintiff's application was denied in December 2003.  *See id*. at 29-33.  Plaintiff subsequently filed a request for a hearing by an ALJ.  *See id*. at 34-35.  On October 20, 2004, a hearing was held before the ALJ, during which the Plaintiff and a vocational expert testified.

**A.   <u>Evidence Before the ALJ</u>**

      **1.   <u>Medical Evidence</u>**

Plaintiff has both physical and psychological impairments.  The record shows that she was treated by physicians and other providers at Bronx Lebanon Hospital ("Bronx Lebanon") from April 2001 to April 2004.  *See id*. at 115-40, 157-94.

          **a.   <u>Physical Impairments</u>**

               **i.   <u>Bronx Lebanon</u>**

Plaintiff's diagnosis of hypertension was first noted in the progress notes from her July 15, 2001 visit to the Bronx Lebanon Clinic.  *See id*. at 191-A.  The attending physician stated that Plaintiff was "on Diovan by another provider" and switched her to HCTZ.  *Id*.  At her follow-up appointment one month later, the

doctor noted that Plaintiff's hypertension was "stable."  *Id*. at 190.  At nearly all of her clinic visits for which the records are available, it was noted that Plaintiff's hypertension was "controlled" or "well controlled" by medication.  *See id*. at 116, 120, 126, 128, 132, 166, 168-A, 170.

At her December 9, 2002 appointment, Dr. Alba Pumarol noted that Plaintiff's hypertension was "well controlled" and gave her a referral for an electrocardiogram ("EKG").  *See id*. at 132. The results of the EKG were summarized as "borderline normal." *Id*. at 139-40.  In the progress notes from her follow-up appointment on December 18, 2002, Dr. Pumarol stated that Plaintiff's EKG results were "suggestive of some ischemic changes" and indicated that Plaintiff should have a stress test. *See id*. at 130.

On April 14, 2003, Plaintiff reported to Dr. Pumarol that, in December 2002, she went to the emergency room complaining of chest pains and heart palpitations and was discharged on the same day.  *See id*. at 127-28.  She reported no other episodes of chest pain.  *See id*.  Dr. Pumarol noted that Plaintiff had been evaluated at another clinic by Dr. Saleen Karen and that she had "started on cozaar."  *Id*. at 128.  After an examination, Dr. Pumarol noted that Plaintiff's hypertension was controlled and that she had no chest pain, shortness of breath, or palpitations. *See id*.  He referred Plaintiff for a stress test and lipid

3

profile.  *See id*.  At her May 2003 follow-up appointment, Dr.

Pumarol stated that the results of Plaintiff's stress test were

normal.  *See id*. at 125.  He also noted: "normal ECG, normal left

vent[rical] size, normal left ventricular function."  *Id*.

### ii.  Consultative Physicians' Reports

After filing her application for SSI benefits, Plaintiff was

seen by numerous consultative physicians for evaluations.  On

January 31, 2003, Dr. Tara Lodha, a consultative internist,

examined Plaintiff.  *See id*. at 100-05.  She reported normal

physical examination results.  Specifically, Dr. Lodha noted,

*inter alia*, that Plaintiff's behavior and affect appeared to be

normal and she had a regular heart rate and rhythm with no

murmurs, rubs, gallops, or clicks.  *See id*. at 101.  She further

noted that Plaintiff was able to ambulate without assistance and

get on and off the examining table without difficulty and that

her station and gait were normal and all of her joints had full

range of motion.  *See id*.  She diagnosed Plaintiff with

hypertension, but noted that it was stable; abnormal EKG, noting

that it required further work up; and depression and anxiety.

*See id*.  With respect to Plaintiff's ability to perform work-

related activities, Dr. Lodha stated that Plaintiff was able to

sit, stand, handle objects, hear, speak, and travel and that she

has difficulty in prolonged walking, heavy lifting, and carrying

heavy objects.  *See id*.

Dr. Graham, an internist, performed a consultative examination of Plaintiff, on August 29, 2003. *See id*. at 106-11. He noted that Plaintiff had a history of hypertension and chest pain for ten months and that the pain occurs one to two times per week, usually with physical exertion. *See id*. at 106. Plaintiff indicated to him that rest relieves the pain and that she takes aspirin daily for this condition. *See id*. Dr. Graham further noted Plaintiff's history of depression and that she claimed some improvement with medications. *See id*. at 106-07. As for Plaintiff's general condition, Dr. Graham found that her behavior was appropriate and that her walk and station were normal. *See id*. at 107. He noted that she was able to get on and off the examination table without difficulty and had a full range of motion in all her joints and adequate muscle strength. *See id*. at 107-08. Dr. Graham also reported that Plaintiff had a regular heart rate with no murmurs or gallops. *See id*. at 108. With respect to Plaintiff's EKG, he reported a regular sinus rhythm, normal axis, the presence of an incomplete right bundle branch block, and that the cardiogram was otherwise negative. *See id*. Dr. Graham gave the following diagnosis: (1) "hypertension, fair control"; (2) "chest pains by history, rule out coronary artery disease"; and (3) "anxiety and depression disorder by history." *See id*. Finally, Dr. Graham found that Plaintiff was able to "walk, sit, stand, lift, carry, handle objects, hear, speak and

5

travel." *Id*. at 109.  He noted, however, that these activities "may be limited by underlying chest pains."  *Id*.

### iii.  **Treating Physician's Report**

Dr. Theresa Bravo, one of Plaintiff's physicians at the Ogden Family Medical Center, which is affiliated with Bronx Lebanon, submitted a medical report in connection with Plaintiff's application for SSI benefits.  *See id*. at 153–56. She reported that Plaintiff suffers from depression, but that it is "well controlled" by her medication.  *See id*. at 153.  With respect to Plaintiff's hypertension, Dr. Bravo stated that Plaintiff has a good response to the medication and is compliant with the treatment.  *See id*.  She listed Plaintiff's diagnoses as hypertension, depression/anxiety, and anemia and noted that Plaintiff responds well to treatment, but needs to continue with assessments and follow-up in the clinic.  *See id*. at 156.

### iv.  **Request for Medical Advice**

In November 2003, the New York State Office of Temporary and Disability Assistance made a request for medical advice to Dr. R. Finley, inquiring as to whether additional cardiac information would be needed to assess Plaintiff's functioning.  *See id*. at 142.  The request noted that, although Plaintiff indicated that she had never had a stress test or cardiac catheterization done, records from Bronx Lebanon indicate that a stress test was performed in April 2003 with normal results.  *See id*.  In

response, Dr. Finley stated,

> It seems to me that as long as you have made appropriate efforts to obtain the actual report of the "stress test" of 4/23/03 . . . we need no further cardiac evaluation in this case.  The claimant is not receiving treatment for ischemic heart disease, and the only reference in file to stress testing indicates that if this has been done at all, the result was normal.  The claimant's EKG findings do not establish the presence of *any* heart disease, let alone that of cardiac ischemia.  Her current chest pains are not attributable to a medically determined impairment and cannot be considered in our functional assessment.

*Id.*

### b.    <u>Psychological Impairments</u>

#### i.    <u>Bronx Lebanon</u>

On April 9, 2001, Plaintiff visited the Bronx Lebanon clinic complaining of neck pain, headaches, and depression and asking for a prescription to treat her depression.  *See id.* at 193-94.  The attending physician prescribed Prozac.  *See id.*  At subsequent appointments, Plaintiff reported that her depression had improved while on Prozac.  *See id.* at 189-91.  In February 2002, Dr. Canon increased the amount of Plaintiff's Prozac prescription and prescribed her Buspar, in response to Plaintiff's request for a "pill for nerves."  *Id.* at 186-87.

In September 2002, Plaintiff was referred to Dr. Steven Baumann[1] at Ogden Behavioral Health, for a psychiatric evaluation

---

[1]  Dr. Baumann is a licensed nurse practitioner, not a physician.  He has a doctorate degree, but the record does not

because she was having a poor response to her medication. *See id*. at 176-78. He reported that Plaintiff had good eye contact, fair concentration, good memory and that her thought processes were clear and goal directed, although somewhat tangential in content. *See id*. at 176. He found that Plaintiff's mood was depressed and that her affect was constricted. *See id*. Plaintiff's speech was clear, her insight and judgment fair, and her impulsivity low. *See id*. Plaintiff denied suicidal or homicidal ideation, hallucinations, and panic attacks. *See id*. Dr. Baumann diagnosed Plaintiff with depression with marked anxiety, agoraphobic symptoms, insomnia, and depressed mood. *See id*. at 176-A. He continued Plaintiff's Buspar prescription, increased her Prozac dosage, and prescribed Ambien for insomnia. *See id*.

Plaintiff saw Dr. Baumann again on December 10, 2002. *See id*. at 131. She indicated that she was "a little better, but . . . still depressed [and] unable to sleep. Dr. Baumann reported mental examination results consistent with those reported during Plaintiff's initial visit. *See id*. He continued to prescribe Plaintiff Prozac and Ambien. *See id*. Notes from two other visits to Dr. Baumann – August 19, 2003 and November 25, 2003 – are also included in the record. *See id*. at 124, 169. Plaintiff's mental examination continued to be consistent,

---

indicate in what field he earned this degree.

however, in his notes from Plaintiff's November 2003 appointment,
Dr. Baumann noted that Plaintiff was experiencing hallucinations.
*See id*.  No changes were made to her medications.  *See id*.

During the time that she was under Dr. Baumann's care,
Plaintiff's depression seemed to improve.  Plaintiff repeatedly
reported to Dr. Baumann and her other doctors that she was
feeling better and that her mood had improved.  *See id*. at 116-
17, 120, 131, 170.  On January 2, 2004, however, she indicated to
Dr. Bravo that she was having anxiety attacks and that she was
unable to work, but that she was "able to function on a daily
basis."  *Id*. at 168.  Subsequently, on March 29, 2004, Dr. Bravo
reported that Plaintiff was "now presenting with some psychotic
features (auditory hallucinations)," as Plaintiff complained of
hearing voices telling her she is going to die.  *Id*. at 161-62.

### ii.  **Consulting Physicians**

On February 10, 2003, Plaintiff was evaluated by consulting
psychiatrist, Dr. G. Caracci.  *See id*. at 104-05.  Plaintiff
reported to Dr. Caracci that the medication helped her but that
she still felt depressed.  *See id*. at 104.  A mental status
examination revealed that Plaintiff's speech was normal in rate
and volume, her mood was euthymic, and her affect was appropriate
to content and full range.  *See id*.  Plaintiff had no formal
thought disorder, delusions, or hallucinations and her memory
concentration and attention span were normal.  *See id*. at 104-05.

Her insight and judgment were fair and she had no suicidal or
homicidal ideation. *See id*. Dr. Caracci diagnosed Plaintiff
with depression and hypertension and provided the following
statement:

> In my opinion, there is a consistency between the
> allegations and my own findings. There is no evidence
> that there is impairment of ability to understand,
> remember and carry out instructions. There is no
> evidence that there is any memory, concentration or
> attention span impairment due to depression. She
> might have mild difficulty tolerating work pressure in
> a work setting due to depression.

*Id*. at 104-05.

Plaintiff underwent a consultative evaluation with Dr. Alain
DeLaChapelle in September 2003. *See id*. at 112-14. Dr.
DeLaChapelle reported that Plaintiff seemed mildly anxious and
depressed and was not hallucinated, delusional, paranoid,
referential, or suicidal. *See id*. at 112. He also noted that
Plaintiff's attention and concentration were adequate and her
insight and judgment were fair. *See id*. Dr. DeLaChapelle
diagnosed dysthymic disorder with hypertension and heart disease
and opined that Plaintiff "has a satisfactory ability to
understand, carry out, and remember instructions, and a
satisfactory ability to respond appropriately to supervision,
coworkers and work pressures, in a work setting." *Id*. at 113.

### iii. <u>**Treating Source's Report**</u>

In connection with Plaintiff's application for SSI benefits,

Dr. Baumann completed a questionnaire on April 20, 2004 regarding Plaintiff's ability to do work-related activities. *See id*. at 150-52.  With respect to "making occupation adjustments," Dr. Baumann rated Plaintiff's ability to deal with the public, deal with work stresses, and maintain attention and concentration as "fair" and gave her a rating of "good" on her ability to follow work rules, relate to co-workers, use judgment, interact with supervisors, and function independently. *See id*.  When asked to describe Plaintiff's limitations, Dr. Baumann wrote:

> P[laintiff] has a long history of depression, anxiety, insomnia [with] agoraphobia[, and] mild hallucinations.  P[laintiff]'s concentration [and] attention are markedly reduced.  She is extremely anxious in public [and] unable to take public transportation.  She is tired [and] unable to sleep. Her thoughts are interrupted by fears [and] hallucinations.

*Id*. at 151.  With respect to job performance, Dr. Baumann gave Plaintiff a rating of "poor/none" on her ability to understand, remember, and carry out complex job instructions and detailed, but not complex, instructions. *See id*.  He rated Plaintiff's ability to carry out simple job instructions as fair. *See id*. Dr. Baumann explained that Plaintiff's "[t]hought processes are generally coherent but highly distracted by intensive fears and illogical thoughts." *Id*.  He further stated that Plaintiff's "[m]emory and comprehension are reduced by her depressed and anxious mood." *Id*.  Finally, in terms of personal-social adjustments, Dr. Baumann rated Plaintiff's ability to maintain

11

her personal appearance and behave in an emotionally stable manner as "fair" and her ability to relate predictably in social situations and demonstrate reliability as "poor/none." *See id.*

On September 28, 2004, Dr. Baumann completed a second questionnaire on Plaintiff's mental impairments, in which he listed Plaintiff's diagnoses as Major Depressive Disorder, recurrent without psychotic features; coronary artery disease; hypertension; and anemia. *See id.* at 195. He indicated that Plaintiff had a current Global Assessment of Functioning ("GAF") score of 50 and a past score of 60 and that the results of her Mini-Mental State Examination ("MMSE") test was 26 out of 30. *See id.* at 195, 197. He stated that Plaintiff suffered from impaired memory and concentration, depressed mood, constricted affect, anxiety, and insomnia. *See id.* at 196. He indicated that Plaintiff's considerable anxiety would cause her difficulty in traveling by bus or subway alone on a daily basis. In eighteen of the twenty categories concerning mental residual functional capacity listed on the questionnaire, Dr. Baumann rated Plaintiff as "markedly limited" or "extremely limited." *See id.* at 199-202. Dr. Baumann stated that Plaintiff was "moderately limited" in her ability to "understand and remember very short and simple instructions" and to "maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." *Id.* Dr. Baumann reported that Plaintiff "is a motivated person who is disabled by her illness." *Id.* at 198.

2.   **Hearing Testimony**

At the hearing, Plaintiff testified, through a Spanish-speaking interpreter, that she last worked in October 2002 in "a welfare office passing papers." *Id*. at 209.  In a Work History Report, which was before the ALJ, Plaintiff indicated that she worked in a clerical job "[d]elivering mail in the building" and using the copy machine.  *Id*. at 78.  She indicated that the heaviest weight she had to lift in this job was 20 pounds and that she frequently lifted up to 10 pounds.  *See id*.  Plaintiff testified that she left the job because she "got sick with depression."  *Id*. at 210.  When asked to describe why she feels she is disabled and unable to work, Plaintiff stated, "I have . . . very advanced stress, I don't feel well.  I don't have the willingness to do anything . . . .  My blood pressure is high."  *Id*.  Plaintiff explained to the ALJ her daily routine, stating that, after getting her daughters ready for school, she usually "lay[s] down."  *Id*. at 212.  She does the housekeeping and cleaning that she is able to, which includes making the beds, doing the dishes, and preparing meals two to three times a week, and is unable to do anything that requires heavy lifting.  *See id*. at 212-13, 215.  She stated that she can only go grocery shopping with assistance from her daughters.  *See id*. at 212.  Plaintiff further testified that she goes out for walks in her

13

neighborhood alone, but can only walk two blocks. *See id.* at 212.

When asked by her attorney to explain what happens when she is depressed, Plaintiff stated, "I feel fat, weak, chest pain, I start cleaning and I feel bad, really bad" and "I don't eat anything, I don't eat well, I eat any little thing." *Id.* at 213. Plaintiff further testified that she is unable to sleep through the night and that the medication only helps "[a] little." *Id.* at 214. She stated that she has nightmares and hears voices that tell her she is going to die. *See id.* She also testified that, since September 11, she has suffered from panic attacks and cannot deal with the public or crowds. *See id.* at 214-15. She indicated that she suffers from a lack of energy and feelings of guilt and worthlessness and that she has no friends and does not socialize. *See id.* at 215. On re-examination by the ALJ, Plaintiff testified that she did not know if she was getting better or worse, stating, "When I'm going to go into a depression even if I take all the pills I still get it." *Id.* at 216.

Dr. Paul Anderson, a vocational expert, also testified at the hearing before the ALJ. *See id.* at 218-22. He testified that Plaintiff's past relevant work included one position, general clerk, which he characterized as "light work, semi-skilled, SVP of three." *Id.* at 218. After Plaintiff clarified that, in her previous position, her primary responsibility was to

deliver "papers" throughout the building and that she did no heavy lifting and did not use the stairs, Anderson classified the job as "mailroom clerk at the light, unskilled level." *Id*. at 220. He opined that a hypothetical person of Plaintiff's age and with her education and work experience, and with her exertional and non-exertional limitations, could perform this work. *See id*. at 218-20. He further testified that he was unable to suggest another occupation that a hypothetical person with Plaintiff's characteristics and residual functional capacity could perform. *See id*. at 221.

## B.   ALJ's Decision

On November 3, 2003, the ALJ issued a decision, concluding that Plaintiff was not disabled for the purpose SSI. *See id*. at 16-23. In reaching this decision, the ALJ found that Plaintiff's alleged heart condition, chest pain, and back pain were not severe and, thus, did not render her disabled within the meaning of the Social Security Act. *See id*. at 17-18. With respect to her psychological impairments, the ALJ found that, while they could be deemed severe, she did not have an impairment severe enough to meet or equal the requirements of one of the listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity and that she has the residual functional capacity to perform her past relevant work as a general mailroom clerk. *See id*. at 18-22. The ALJ

15

rejected Dr. Baumann's opinion concerning Plaintiff's ability to complete a normal work day and work week without interruptions from her psychologically based symptoms and found that the Plaintiff's testimony was not credible.  *See id.* at 20-21.  He credited the testimony of the vocational expert, Dr. Paul Anderson.  *See id.* at 21-22.

## C.   Appeals Council Decision

Plaintiff filed a request for review of the ALJ's decision to the Appeals Council.  *See id.* at 11-12.  In March 2005, the Appeals Council denied her request, rendering the ALJ's decision the final decision of the Commissioner.  *See id.* at 5-7.

In June 2005, Plaintiff commenced this action seeking review of the Commissioner's decision.  Plaintiff stated in her complaint that her disability was due to "stress, depression[,] high blood pressure[, and] nerv[]ousness."  Compl. at ¶ 4.  The Commissioner subsequently filed the instant motion.[2]

## II.   APPLICABLE LEGAL PRINCIPLES

## A.   Standard of Review

Rule 12(c) of the Federal Rules of Civil Procedure states that a party is entitled to judgment on the pleadings if he or

---

[2]   Plaintiff has not responded to the Commissioner's motion. This, however, is not grounds for dismissal of her complaint. The Second Circuit has held that if "the pleadings are themselves sufficient to withstand dismissal," a *pro se* complaint will not be dismissed simply because the complainant failed to respond to a Rule 12(c) motion.  *Maggette v. Dalsheim*, 709 F.2d 800, 802 (2d Cir. 1983).

she establishes that no material facts are in dispute and that he
or she is entitled to judgment as a matter of law.  *See Oneida
Indian Nation v. City of Sherril,* 337 F.3d 139, 152 (2d Cir.
2003); *Morcelo v. Barnhart*, No. 01 Civ. 0743, 2003 WL 470541, at
*4 (S.D.N.Y. Jan. 21, 2003).  The scope of review in an appeal
from a social security disability determination involves two
levels of inquiry.  First, the court must review the
Commissioner's decision to determine whether the Commissioner
applied the correct legal standard when determining that the
plaintiff was not disabled.  *See Tejeda v. Apfel,* 167 F.3d 770,
773 (2d Cir. 1999).  Failure to apply the correct legal standard
is grounds for reversal of the ruling with no second level of
inquiry.  *See Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir.
1984).  Second, the court must decide whether the Commissioner's
decision was supported by substantial evidence.  *See Green-
Younger v. Barnhart,* 335 F.3d 99, 105-06 (2d Cir. 2003).
"Substantial evidence means such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion."  *Id*. at 106 (internal citations omitted).  When
determining whether substantial evidence supports the
Commissioner's decision, it is important that the court
"carefully consider[] the whole record, examining evidence from
both sides."  *Tejada,* 167 F.3d at 774 (citing *Quinones v. Carter,*
117 F.3d 29, 33 (2d Cir. 1997).  "It is not the function of a

reviewing court to decide *de novo* whether a claimant was disabled." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999). Therefore, if the Commissioner applies the correct legal standard and the "decision rests on adequate findings supported by evidence having rational probative force, [this Court cannot] substitute [its] own judgment for that of the Commissioner." *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir. 2002).

**B.   Determining Disability**

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In determining whether an individual is disabled within the meaning of the Act, the Commissioner must consider "the combined effect of all of the individual's impairments." *Id.* at § 423(d)(2)(B).  Such impairments must be

> of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* at § 423(d)(2)(A).  When making this determination, the Commissioner must examine certain facts, including, "(1) the objective medical facts; (2) diagnoses or medical opinions based

on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983)(*per curiam*).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. *See* 20 C.F.R. § 416.920(a)(4). First, the Commissioner will find that the claimant is not disabled unless the claimant can show that he is not working in "substantial gainful activity." *Id*. at § 416.920(a)(4)(i), (b). Second, the medical severity of the claimant's impairments must be considered. *Id*. at § 416.920(a)(4)(ii). The claimant's impairment will not be deemed severe "[i]f [he] do[es] not have any impairment or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities." *Id*. at § 416.920(c). Third, if it is found that the claimant's impairments are severe, the Commissioner will determine if the claimant has an impairment that meets or equals one of the impairments presumed severe enough to render one disabled, which are listed in appendix 1 of to Part 404, Subpart P of the social security regulations. *See id*. at § 416.920(a)(4)(iii), (d). If the claimant's impairments are not on the list, the Commissioner proceeds to the fourth step and assesses the claimant's residual functional capacity to determine whether he can do his past relevant work. *See id*. at

§ 416.920(a)(4)(iv), (e)-(f).  Finally, if it is found that the claimant cannot do his past relevant work, the Commissioner will consider the claimant's residual functional capacity, age, education, and work experience to see if he can make an adjustment to other work.  *See id.* at § 416.920(a)(4)(v), (g). The claimant bears the burden of proof on the first four steps of this analysis.  *See DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the ALJ concludes at an early step of the analysis that the claimant is not disabled, he need not proceed with the remaining steps.  *See Williams v. Apfel*, 204 F.3d 48, 49 (2d Cir. 2000).  If the fifth step is necessary, the burden shifts to the Commissioner to show that the claimant is capable of other work.  *See DeChirico*, 134 F.3d at 1180.  This five-step approach applies to the Commissioner's analysis of both physical and mental impairments.  *See* 20 C.F.R. § 416.920a(a).

In analyzing a claimant's impairments, an ALJ "has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits."  *Pogozelski v. Barnhart*, No. 03 CV 2914, 2004 WL 1146059, at *10 (E.D.N.Y. May 19, 2004).  "The ALJ's duty to assist a claimant in obtaining complete medical records works in tandem with the so-called 'treating physician rule,' which requires the ALJ to grant controlling weight to the opinion of a claimant's treating physician if the opinion is well supported by medical findings and is not inconsistent with other substantial

evidence." *Rosado v. Barnhart*, 290 F.Supp.2d 431, 438 (S.D.N.Y. 2003).

Where a claimant is not represented by counsel in the administrative proceedings, the ALJ has a heightened duty to develop the record. *See Dimitriadis v. Barnhart*, No. 02 Civ. 9203, 2004 WL 540493, at *9 (S.D.N.Y. Mar. 17, 2004). Here, Plaintiff was not represented by a lawyer at the hearing. Instead, she was represented by a "Carmen Burgos," who, according to the signature line of a letter written by her that is included in the record, is a paralegal at the Legal Aid Society. *See* AR at 203. "[W]here the claimant is unrepresented by counsel, the ALJ has a duty to probe scrupulously and conscientiously into and explore all the relevant facts . . . and to ensure that the record is adequate to support his decision." *Melville*, 198 F.3d at 51 (internal citations omitted).

### III.  <u>DISCUSSION</u>

#### A.  <u>Physical Impairments</u>

The ALJ concluded his analysis of Plaintiff's hypertension and chest pain at the second step of the disability inquiry, finding that neither alleged impairment was severe. As stated above, "[a]n impairment or combination of impairments is not severe if it does not significantly limit [an individual's] physical or mental ability to do basic work activities." 20

C.F.R. § 416.921(a).  "Basic work activities" are the "activities and aptitudes necessary to do most jobs, including:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

> (2) Capacities for seeing, hearing, and speaking;

> (3) Understanding, carrying out, and remembering simple instructions;

> (4) Use of judgment;

> (5) Responding appropriately to supervision, co-workers and usual work situations; and

> (6) Dealing with changes in a routine work setting.

*Id.* at § 416.921(b).  "The severity requirement cannot be satisfied when medical evidence shows that the person has the ability to perform basic work activities."  Social Security Ruling ("SSR") 85-28, Titles II and XVI: Medical Impairments That Are Not Severe, 1985 WL 56856 (S.S.A. 1985).

"[I]t is rare that a claim will end at step two of the analysis."  *Meashaw v. Chater*, No. 94-CV-1154, 1997 WL 16345, at *4, n.6 (N.D.N.Y. Jan 7, 1997).  *See also Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).  In a concurring opinion in *Bowen v. Yuckert*, 482 U.S. 137 (1987), Justice O'Connor discussed her view that the Commissioner should not deny benefits to a claimant whose impairments fit within the statutory definition of disability without determining whether the impairments prevent the claimant from engaging in his prior work or other work that

may be available to him in the national economy.  Justice
O'Connor stated, "Only those claimants with slight abnormalities
that do not significantly limit any 'basic work activity' can be
denied benefits without undertaking this vocational analysis."
*Id*. at 158 (O'Connor, J., *concurring*).  Since the Supreme Court's
decision in *Yuckert*, nearly every circuit court of appeals,
including the Second Circuit, has followed Justice O'Connor's
position and held that the severity analysis of step two must
only be used to screen out "*de minimus*" claims.  *See Dixon,* 54
F.3d at 1030.  *See also Anthony v. Sullivan*, 954 F.2d 289, 294-95
(5th Cir. 1992); *Bailey v. Sullivan,* 885 F.2d 52, 56-57 (3rd Cir.
1989); *McDonald v. Secretary of Health & Human Servs.,* 884 F.2d
1468, 1476-77 (1st Cir. 1989); *Hudson v. Bowen,* 870 F.2d 1392,
1395-96 (8th Cir. 1989); *Higgs v. Bowen*, 880 F.2d 860, 862-63
(6th Cir. 1988); *Stratton v. Bowen*, 827 F.2d 1447, 1453 (11th
Cir. 1987); *Eviles v. Barnhart*, No. 02-CV-4252, 2004 WL 1146055,
at *6 (E.D.N.Y. May 11, 2004).

Here, the ALJ concluded that Plaintiff's hypertension and
chest pain were not severe because the medical evidence indicated
that her EKG and stress test results were normal and that she had
a normal heart rate and sinus rhythm.  *See* AR at 17.  He also
noted that Plaintiff was not undergoing any treatment for
ischemic heart disease and that, while she has a history of high
blood pressure, it is controlled by prescribed medication.  While

23

all these facts are supported by the medical evidence, there is
information in the medical records concerning Plaintiff's
complaints of chest pain that required further attention from the
ALJ.  In SSR 96-3p, the Social Security Administration ("SSA")
made clear that, "[b]ecause a determination whether an
impairment(s) is severe requires an assessment of the
functionally limiting effects of an impairment(s), symptom-
related limitations and restrictions must be considered at this
step of the sequential evaluation process, provided that the
individual has a medically determinable impairment(s) that could
reasonably expected to produce the symptoms."  SSR 96-3p, Policy
Interpretation Ruling Titles II and XVI: Considering Allegations
of Pain and Other Symptoms in Determining Whether a Medically
Determinable Impairment is Severe, 1996 WL 374181 (S.S.A. 1996).

The record contains evidence that Plaintiff suffered from
chest pains.  Progress notes from Plaintiff's April 2003 visit
with Dr. Pumarol at the Bronx Lebanon clinic indicate that
Plaintiff had gone to the emergency room in December 2002 with
complaints of chest pain.  *See id*. at 127-28.  These notes also
reveal that Plaintiff had been evaluated at another clinic by Dr.
Saleen Karen and had started taking cozaar. *See id*.  After his
examination, Dr. Pumarol referred Plaintiff for a stress test and
lipid profile.  While Dr. Pumarol noted in a follow-up
appointment that the results of Plaintiff's stress test were
normal, the record does not include a record of these test

24

results.  Also missing from the administrative record are records
from Plaintiff's emergency room visit and her evaluation by Dr.
Saleen Karen.  Further, the report from one of Plaintiff's
treating physicians, Dr. Bravo, made no mention of Plaintiff's
history of chest pains.  In his report, consultative physician
Dr. Graham opined that Plaintiff may be limited in her ability to
perform basic work activities due to her underlying chest pain.
*See* AR at 109.  The ALJ, however, declined to give any weight to
this finding because the record did not indicate that Plaintiff
had a severe cardiac condition that caused such chest pains.

"Statements about a claimant's pain cannot alone establish
disability; there must be medical evidence that shows that the
claimant has a medically determinable impairment that could
reasonably be expected to produce the pain or other symptoms
alleged."  *Davis v. Massanari*, No. 00 Civ. 4330, 2001 WL 1524495,
at *6 (S.D.N.Y. Nov. 29, 2001)(citing *e.g.*, 42 U.S.C.
§ 423(d)(5)(A); 20 C.F.R. 404.1529(a)).  "However, if a claimant
alleges pain or other symptoms that are not substantiated by the
medical or laboratory evidence, the ALJ is required to 'develop
evidence regarding the possibility of a medically determinable
mental impairment,' when there is information to suggest that
such an impairment exists."  *Miller v. Barnhart*, No. 01 Civ.
2744, 2004 WL 1304050, at *9 (S.D.N.Y. May 6, 2004)(quoting 20
C.F.R. §§ 404.1529(b), 416.929(b)).  Here, the record contains
information that suggests that Plaintiff has an underlying

physical condition that may be causing her chest pains.  As noted above, Plaintiff discussed her chest pains with Dr. Pumarol and visited the emergency room on one occasion complaining of such pains.  Dr. Pumarol also noted that Plaintiff's EKG results were indicative of ischemic changes that required a follow-up stress test and lipid profile.  Dr. Lodha, a consultative physician, stated that Plaintiff's EKG results were abnormal and that further work up was needed.

Presented with such evidence, the ALJ should have developed the record to include records from Plaintiff's December 2002 emergency room visit and her visit with Dr. Saleen Karen and the results of any stress test that was performed.  In addition, the ALJ should have obtained a report from Dr. Pumarol, as he was a treating physician with whom Plaintiff expressly discussed her chest pains.  Moreover, Plaintiff saw this doctor on numerous visits to the Bronx Lebanon clinic and, in his report from one of her visits, he indicated that he analyzed her stress test results.  Finally, the ALJ should have obtained a more thorough report from Dr. Bravo, the only treating physician to provide a report on Plaintiff's physical impairments.  While Dr. Bravo noted that Plaintiff's hypertension was controlled by medication, she made no mention of Plaintiff's chest pain and did not express an opinion as to how Plaintiff's impairments may affect her ability to work.  *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)("[I]f the clinical findings [are] inadequate, it [is] the

ALJ's duty to seek additional information from [the treating physician] sua sponte."); *Devora v. Barnhart*, 205 F.Supp.2d 164, 172-73 (S.D.N.Y. 2002) ("The duty of the ALJ to develop the record is particularly important when it comes to obtaining information from a claimant's treating physician."). This Court should, therefore, conclude that the ALJ's finding that Plaintiff's physical impairments were not severe was not based on substantial evidence and remand the matter to the ALJ. If your Honor agrees with this recommendation, the ALJ should be instructed to develop the record with respect to Plaintiff's physical impairments with the additional evidence described herein.

**B.     Mental Impairments**

As previously stated, the five-step sequential analysis applies to mental impairments. Where mental complaints are at issue, however, the Commissioner "must follow a special technique at each level in the administrative review process." 20 C.F.R. § 416.920a(a). The determination that a claimant is disabled by a severe mental impairment is a two-step process. First, the ALJ must evaluate the claimant's symptoms, as well as other signs and laboratory findings, and determine whether the claimant has a medically determinable impairment. *Id.* at § 416.920a(a), (b)(1). If a medically determinable impairment exists, the ALJ must "rate the degree of functional limitation resulting from the impairment." *Id.* at § 416.920a(b)(2). This process requires the

ALJ to examine all relevant clinical and laboratory findings, as well as the effects of the symptoms on the claimant, the impact of medication and its side effects and other evidence relevant to the impairment and its treatment.  *Id.* at § 416.920a(c)(1).  Specifically, the ALJ must rate the degree of the claimant's functional limitation in four specific areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings.  *Id.* at § 416.920a(c)(3).  The ALJ rates the first three areas on a five-point scale of "none," "mild," "moderate," "marked," and "extreme" and the fourth area on a four-point scale of "none," "one or two," "three," and "four or more."  20 C.F.R. Pt. 404, subpt. P, app. 1 at § 12.00C, 20 C.F.R. § 416.920a(c)(4).  If the first three areas are rated as "none" or "mild" and the fourth as "none", the ALJ will generally conclude that the mental impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities."  *Id.* at § 416.920a(d)(1).

In addition, the ALJ is required to incorporate into his or her written decision the pertinent findings and conclusions regarding the claimant's mental impairments.  *Id.* at § 416.920a(e)(2).  His "decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a

28

conclusion about the severity of the mental impairment(s)."  *Id*.;
*see also* SSR 85-16, Titles II and XVI: Residual Functional
Capacity for Mental Impairments (S.S.A. 1985).  The decision must
also "include a specific finding as to the degree of limitation
in each of the functional areas described in paragraph (c) of . .
. section [416.920a]."  20 C.F.R. § 416.920a(e)(2); *see also*
*Schaal v. Callahan*, 993 F.Supp. 85, 93-94 (D.Conn. 1997).
Failure to do so is grounds for remand.  *See Snell v. Apfel,* 177
F.3d 128, 133-34 (2d Cir. 1999); *Schaal*, 134 F.3d at 505.  "The
requirement of reason-giving exists, in part, to let claimants
understand the disposition of their cases, even - and perhaps
especially - when those dispositions are unfavorable."  *Snell*,
177 F.3d at 134.

Here, the ALJ concluded that Plaintiff's mental impairments
were severe under step two of the sequential analysis.  In its
memorandum of law, the Commissioner concedes that this finding
was supported by substantial evidence.  *See* Defendant's
Memorandum of Law at 18.  The ALJ next found that Plaintiff did
not have an impairment listed in Appendix 1 of the social
security regulations.  He stated that he evaluated Plaintiff's
depression under Section 12.04 of Appendix 1 and her anxiety
under Section 12.06 and found that she met the threshold
diagnostic requirements of these listings.  He, however,
concluded that Plaintiff did not meet the criteria listed under
part B of these sections.  Specifically, the ALJ found:

> She has no more than a mild restriction of activities
> of daily living as she has been able to care for her
> 12 and 16-year old daughters and do routine household
> chores.  Her depression causes no more than moderate
> difficulties with social functioning and her ability
> to maintain concentration, persistence and pace.  She
> does not use public transportation but goes for walks
> and goes over to her niece's house once a week.  She
> is able to handle her finances including paying bills
> and managing a checkbook . . . .  One-to-two episodes
> of decompensation of an extended duration are
> documented in the record, but the objective evidence
> in the record does not document any of the "C"
> criteria in Section 12.04 or 12.06.  Thus, the
> undersigned Administrative Law Judge finds that the
> claimant is not disabled at step three of the
> sequential evaluation process in terms of any
> depressive or anxiety disorder.

AR at 18-19.

While the ALJ considered the degree of Plaintiff's functional limitations in the four functional areas set forth in § 416.920a(b)(3) of the applicable regulations, he did not correctly apply the special technique to steps two and three of the sequential evaluation process.  According to this special technique, the ALJ was required to determine whether a medically determinable impairment exists and to then rate the degree of functional limitation in the four areas in order to determine whether the impairment is severe.  20 C.F.R. at § 416.920a(b)-(d).  The ALJ, however, concluded that Plaintiff's mental impairment was severe before considering her functional limitations.  If the matter is remanded to the ALJ, in a new decision the ALJ should properly follow the sequence set forth in

§ 416.920a for determining whether Plaintiff's mental impairments are severe.

The ALJ based his denial of Plaintiff's request for benefits on his finding that she has the residual functional capacity to perform her past relevant work as a general mailroom clerk.  He found:

> [C]laimant has had the residual functional capacity to occasionally lift and carry 50 pounds and 25 pounds frequently.  She can sit, stand and walk for eight hours.  The claimant is also able to understand, remember and carry out instructions, make work-related decisions, respond appropriately to supervision, co-workers and usual work situations and handle changes in routine work settings appropriately on a sustained and continuous basis; but she requires work which does not deal with the public or working in large crowds of strangers.  Considering the claimant's residual functional capacity, she can perform her past relevant work as a general mailroom clerk since this job falls within her functional capabilities.

AR at 19.

In determining whether a claimant has the residual functional capacity to perform her past relevant work, the ALJ must consider each of the claimant's medically determinable impairments, even those that are not "severe."  20 C.F.R. § 416.945(a)(2).  The ALJ must assess the nature and extent of the claimant's physical and mental limitations and determine the claimant's residual functional capacity for work activity "on a regular and continuing basis."  *Id.* at 416.945(b), (c).  "A 'regular and continuing basis' means 8 hours a days, for 5 days a week, or an equivalent work schedule."  *Melville*, 198 F.3d at 52.

With respect to a claimant's physical abilities, "[a] limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions" may reduce an individual's abilities to do past work and other work.  20 C.F.R. § 416.945(b).  In terms of mental abilities, "limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting" may reduce an individual's abilities to perform past work and other work.  *Id*. at 416.945(c).

In making his determination regarding Plaintiff's residual functional capacity, the ALJ considered the medical reports from the Bronx Lebanon clinic and from Plaintiff's visits with Dr. Baumann at Ogden Behavioral Health, which show that she had been treated for depression since April 2001 and that her symptoms had improved while taking Prozac.  *See* AR at 19.  In 2002, Plaintiff had increased problems with depression and her dosage of Prozac was adjusted.  *See id*.  The ALJ noted that, in December 2002, Plaintiff began seeing Dr. Baumann, who diagnosed her with major depressive disorder, insomnia, and agoraphobia and adjusted her medication regimen.  *See id*.  The ALJ further noted that, while under Dr. Baumann's care, Plaintiff showed improvement in her mental status.  *See id*.  The ALJ also considered the reports of Dr. Caracci and Dr. DeLaChapelle, who performed consultative examinations of Plaintiff.  *See id*. at 19-20.  The consultative

physicians opined that Plaintiff was not impaired in her ability to understand, remember, and carry out instructions, or in her memory, concentration, or attention span.  The ALJ noted Dr. Caracci's opinion that Plaintiff might have some mild difficulty tolerating work pressures in a work setting due to her depression.

The ALJ also noted the findings and opinion of Plaintiff's treating source for her psychological impairments, Dr. Baumann. The ALJ, however, declined to give any weight to the opinion Dr. Baumann expressed in his second report, stating that his opinion "is not supported by the objective evidence of record."  *Id*. at 20.  He explained, "In this regard, Dr. Baumann's own treatment notes show that the claimant has been doing well with prescribed medication," and cited to a specific page of the medical records. *Id*.

Because Dr. Baumann is a licensed nurse practitioner who has his Ph.D.,[3] he is not an "acceptable medical source" as defined by the regulations and, therefore, his opinion is not entitled to controlling weight under the treating physician rule.  *See Pogozelski*, 2004 WL 1146059, at *12.  *See also* 20 C.F.R. §§ 416.913(a)(1)-(4)(defining acceptable medical sources to include: (1) licensed physicians, (2) licensed or certified psychologists,

---

[3]  There is nothing in the record to indicate whether Dr. Baumann has his Ph.D. in psychology or if he is a licensed psychologist.

33

(3) licensed optometrists, (4) licensed podiatrists, and qualified speech-language pathologists), 416.916(d)(1)(listing nurse practitioners and therapists as other medical sources). Courts agree, however, that, even if not an acceptable medical source, a primary care provider's opinion should be accorded some weight. *See Mongeur v. Heckler*, 722 F.2d 1033, 1039, n.2; *White v. Comm'r of Soc. Sec.*, 302 F.Supp.2d 170, 176 (W.D.N.Y. 2004); *Mejia v. Barnhart*, 261 F.Supp.2d 142, 148 (E.D.N.Y. 2003); *Rivera v. Bowen*, 665 F.Supp. 201, 206 (S.D.N.Y. 1987).

As the sole treating source who provided a report to the Commissioner on Plaintiff's psychological impairments, Dr. Baumann's opinion should have been given accorded weight by the ALJ. Although not a physician, Dr. Baumann developed a treatment relationship with Plaintiff over a two-year period. "[A]s 'an other medical source' pursuant to 20 C.F.R. § 404.1513(d)(1)," his opinion is worthy of some consideration. *Mejia*, 261 F.Supp.2d at 148. Further, the ALJ's reason for rejecting Dr. Baumann's opinion is insufficient. The ALJ explained that the opinion contradicted substantial evidence in the record, particularly, Dr. Baumann's own contemporaneous progress notes. While the page to which the ALJ cited is a progress record from one of Plaintiff's appointments at the Bronx Lebanon clinic indicating that Plaintiff is "doing well" on her medication, it does not contain the treatment notes of Dr. Baumann. *See id*. at 166. This progress record includes the notes of Dr. Melanie

34

Canon.  *See id*.  Moreover, these notes seem to indicate that
Plaintiff was "doing well" on her blood pressure medications, not
the medications taken for her psychological impairments.  *See id*.
The latest treatment notes of Dr. Baumann that are included in
the record are not contemporaneous with his second report.  They
are from Plaintiff's November 2003 appointment, nearly one year
before he completed the second report.  *See id*. at 169.
Furthermore, progress notes from Plaintiff's Bronx Lebanon visits
in 2004 suggest that Plaintiff's depression and anxiety symptoms
may have been worsening.  For instance, at her January 2, 2004
visit to the clinic, Plaintiff indicated that, while she was able
to function on a daily basis, she was suffering from anxiety
attacks and was unable to work.  *See id*. at 168.  On March 29,
2004, Plaintiff reported that she was very nervous and was
hearing voices telling her that she was going to die.  *See id*. at
161.  The presence of these increased symptoms, particularly
auditory hallucinations, may have led Dr. Baumann to the findings
and opinion set forth in his second report.

    If your Honor agrees that this matter should be remanded to
the ALJ for further development of the record, I recommend that
the ALJ also be instructed to obtain further opinion evidence
from Plaintiff's treating sources as to her mental impairments,
specifically information from an "acceptable medical source,"
such as a physician from the Bronx Lebanon clinic who assessed
Plaintiff's psychological condition.  *See Dimitriadis v.*

*Barnhart*, No. 02 Civ. 9203, 2004 WL 540493, at *10 (S.D.N.Y. Mar. 17, 2004)(holding that, although ALJ obtained an opinion from physician's assistant, he should have obtained an opinion from the physician himself, an acceptable medical source).  The ALJ could, in addition to seeking further information from Dr. Bravo as to Plaintiff's physical impairments, advise Dr. Bravo to provide her opinion on the extent of Plaintiff's psychological impairments.

Another issue that should be explored by the ALJ on remand is the nature of Plaintiff's past relevant work.  In SSR 82-62, Title II and XVI: A Disability Claimant's Capacity to Do Past Relevant Work, In General, 1982 WL 31386 (S.S.A. 1982), the SSA explained the meaning of past relevant work.  The ruling stated, "We consider that your work experience applies when it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity."  *Id*.  The SSA regulations provide that work is considered substantial if it "involves doing significant physical or mental activities," 20 C.F.R. § 416.972(a), and is considered gainful if it "is the kind of work usually done for pay or profit, whether or not a profit is realized," *id*. at § 416.972(b).  The regulations further provide that "work that involves minimal duties that make little or no demands on [the claimant] and that are of little or no use to [the] employer . . . does not show that [the claimant] is working at the substantial gainful activity level."  *Id*. at

§ 416.973(b).

In *Melville*, the Second Circuit examined the relevant SSR's and regulations and set forth the inquiry that must be made at step four of the sequential evaluation analysis:

> [S]tep four of the sequential process requires an inquiry into the claimant's ability to do her "past relevant work"; a claimant's past work experience, especially part-time work, is not "relevant" unless, *inter alia*, it was "substantial gainful activity"; and a proper assessment of whether past work was substantial gainful activity requires evaluation of, *inter alia*, how well the claimant performed her duties, whether those duties were minimal and made little or no demand on her, what her work was worth to the employer, and whether her income was tied to her productivity.

198 F.3d at 53-54.  The issue in *Melville* concerned the ALJ's failure to recognize and consider that the plaintiff's prior part-time work was workfare.  *See id*.  The Court found that the ALJ had improperly failed to develop the record as to whether the plaintiff's workfare assignment constituted substantial gainful activity.  The Court stated, "Without developing the record along these lines, the ALJ could not properly assess whether Melville's workfare assignment could be considered substantial gainful work; if it could not, Melville's performance of that assignment did not, according to SSA regulations, constitute past relevant work."  *Id*. at 54.

Here, the record strongly suggests that the only prior work performed by Plaintiff was workfare.  In her application for benefits, Plaintiff stated that she received public assistance

37

and that she "worked for [her] benefit (welfare)." AR at 59. At the hearing, she stated that she worked in a welfare office. *See id*. at 209. Despite Plaintiff's statement in her application, the ALJ did not attempt to determine whether her work in this office was workfare; nor did he determine whether Plaintiff worked full-time or part-time. Like the ALJ in *Melville*, the ALJ in this case failed to inquire as to whether Plaintiff was able to perform the normal work of a paid mailroom clerk, whether her duties were minimal from the standpoint of the employer, or whether her welfare benefits were conditioned on her productivity as a mailroom clerk. *See id*. at 54. In the absence of such information, the ALJ lacked sufficient evidence to determine whether Plaintiff had the residual functional capacity to perform her past relevant work. Accordingly, if your Honor remands the matter for further development of the record, the ALJ should be instructed to make the necessary inquiry regarding Plaintiff's past relevant work.

As a final matter, the Court should consider the ALJ's finding that Plaintiff's testimony was not credible. In making this finding, the ALJ stated,

> The objective evidence of record reveals that the claimant's hypertension has been under control with prescribed medication . . . . Further, neither the claimant's physical condition not her mental status has precluded her from going for walks, taking care [of] her daughters, doing routine household chores, going over to her niece's house once a week or handling finances which includes paying bills and managing a checkbook.

38

AR at 21.  A review of Plaintiff's disability application and
hearing testimony reveals that the ALJ may have overstated the
extent to which Plaintiff can engage in these activities.  While
Plaintiff indicated that she goes for walks, she noted that she
cannot walk for very long and specified at the hearing that she
can only walk two blocks.  *See id*. at 87, 212.  Her application
also indicates that, while she takes care of her daughters, they
give her a great deal of assistance.  *See id*. at 85, 211-13.  The
Second Circuit has "stated on numerous occasions that a claimant
need not be an invalid to be found disabled under the Social
Security Act."  *Balsamo v. Chater,* 142 F.3d 75,81 (2d Cir.
1998)(internal citations omitted).  With this in mind, on remand,
the ALJ should reconsider his assessment of Plaintiff's
credibility in light of the record evidence and the additional
evidence that he obtains.

## IV.  **CONCLUSION**

Accordingly, based on the foregoing reasons, it is
respectfully recommended that your Honor deny the Commissioner's
motion for judgment on the pleadings and remand the matter to the
ALJ for further development of the record in accordance with this
Report and Recommendation.

## V.  **NOTICE**

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Rule
72(b), Fed. R. Civ .P., the parties shall have ten (10) days,

plus an additional three (3) days, pursuant to Rule 6(e), Fed. R.
Civ. P., or a total of thirteen (13) working days, (*see* Rule
6(a), Fed. R. Civ. P.), from the date hereof, to file written
objections to this Report and Recommendation.  Such objections,
if any, shall be filed with the Clerk of the Court, with extra
copies delivered to the chambers of The Honorable Colleen
McMahon, at the United States Courthouse, 500 Pearl Street, Room
640, New York, New York 10007, and to the chambers of the
undersigned at Room 434, 300 Quarropas Street, White Plains, New
York 10601.

Failure to file timely objections to the Report and
Recommendation will preclude later appellate review of any order
to judgment that will be entered by Judge McMahon.  *See Thomas v.
Arn*, 474 U.S. 140 (1985); *Frank v. Johnson*, 968 F.2d 298 (2d
Cir.), cert. denied 113 S. Ct. 825 (1992); *Small v. Secretary of
H.H.S.*, 892 F.2d 15,16 (2d Cir. 1989) (*per curiam*); *Wesolek v.
Canadair, Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988).  Requests for
extensions of time to file objections must be made to Judge
McMahon and should not be made to the undersigned.

Date: January 9 , 2007
White Plains, New York

Respectfully submitted,

_____
MARK D. FOX
UNITED STATES MAGISTRATE JUDGE

40

Copies of the foregoing report and recommendation have been sent to the following:

The Honorable Colleen McMahon, U.S.D.J.

Ana S. Tejada
159 Radford Street, Apt. 5A
Yonkers, New York 10705

Susan C. Branagan, Esq.
Special Assistant U.S. Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007